**In re Richard SHAFER and Nancy Webb, Debtors.**

No. 07–15085.

United States Bankruptcy Court, W.D. Wisconsin.

June 9, 2008.

Robert T. Kasdorf, Madison, WI, for Debtors.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Bankruptcy Judge.

The married debtors first filed a voluntary chapter 13 petition and plan on May 31, 2007. That case was voluntarily dismissed and after a brief interval they filed this case. A final hearing on plan confirmation was held on April 8, 2008. The issue of the debtors' good faith was taken under advisement.

Creditors Louise Katz and Heartsprings, Inc. and the trustee object to the debtors' expenses of $8,220, including a $3,721/month mortgage, $275 for "repairs," $960 for food, $240 for clothing, and $600 for transportation. The debtors have not claimed that they are entitled to a departure from government standards. Ms. Katz and Heartsprings also object to the debtors' expenses related to the debtors' adult disabled son, who lives in his own apartment and receives government assistance.

The creditors allege that the debtors under-value their assets. The parties stipulated that the value of the debtors' homestead is $550,000, although their testimony suggested that they paid nearly that amount in 2006 to renovate the house. Ms. Katz claims that the debtors understate the value of their household goods. She also notes that certain valuable items listed in the debtors' prior filing are inexplicably absent in the current schedules.

Ms. Katz and the trustee object to the treatment of what were preferential payments to creditors in a prior chapter 13 case filed on May 31, 2007 and voluntarily dismissed by the debtors in October, 2007. Payments of $40–50,000 were made to creditors within 90 days prior to filing that case. Both Ms. Katz and the trustee point out that the current filing is materially identical to the prior filing, except that the preferential payments are no longer recoverable.

These numerous objections all center on the debtors' lack of good faith. Debtors

claim they have met the letter of the law and that is all that can be required of them. They put in issue whether, or to what extent, the "totality-of-the-circumstances" test may be applied after BAPC-PA and *Mancl v. Chatterton (In re Mancl)*, 381 B.R. 537 (W.D.Wis., Feb.12, 2008).

The good faith requirement in § 1325(a)(3) has remained unchanged since it was adopted in 1978 until today. ("[T]he court shall confirm a plan if ... the plan has been proposed in good faith and not by any means forbidden by law.") At the time, "[t]he established historical meaning of 'good faith,' a term used throughout the [former] Bankruptcy Act, required merely that the plan conform with the provisions, purposes, and spirit of chapter 13." *Collier on Bankruptcy* 1325.LH[1][b] (15th ed.2006).

From 1978 to 1984, perhaps from lack of statutory guidance, "the courts seemed almost obsessed" with the chapter 13 debtor's efforts to pay creditors in the context of good faith. Keith M. Lundin, *Chapter 13 Bankruptcy* § 193.1 (3d ed.2006). Some courts in this period required the debtor to make "meaningful" or "substantial" repayments in order to pass the good faith test. However, this approach has been criticized as ignoring the purpose of chapter 13. A primary goal of the bankruptcy reform effort prior to 1978 was to promote greater and more widespread use of chapter 13.

The seminal case from the Court of Appeals for the Seventh Circuit, *In re Rimgale*, held that good faith was determined by the totality of the circumstances, and listed five factors ("by no means exhaustive") relevant in the determination of good faith:

(1) Does the proposed plan state [the debtor's] secured and unsecured debts accurately?

(2) Does it state [the debtor's] expenses accurately?

(3) Is the percentage of repayment of unsecured claims correct?

(4) If there are or have been deficiencies in the plan, do the inaccuracies amount to an attempt to mislead the bankruptcy court?

(5) Do the proposed payments indicate a fundamental fairness in dealing with one's creditors? [1]

*In re Rimgale*, 669 F.2d 426, 432–33 (7th Cir.1982) (footnotes and punctuation marks omitted).

*Rimgale* further opined, "[b]roadly speaking, the basic inquiry should be whether or not under case circumstances there has been abuse of Chapter 13's provisions, purpose, or spirit. This inquiry imposes a considerable responsibility on bankruptcy judges." *Id.* at 433. It is worth noting that four of five of these factors bear on the accuracy of the debtor's schedules.

In 1984 the "best-efforts" test made its first appearance in the Code, codified in § 1325(b). Under that section, upon ob-

---

**1.** Footnote 22 in *Rimgale* expands on the fifth factor, and has been given much attention:

In this connection, the bankruptcy court may wish to examine the timing of the bankruptcy filings, the proportion of the total unsecured debt that is represented by the *Ravenot* judgment, and the equities of classifying together ordinary consumer debt and a judgment debt arising out of intentionally tortious conduct. See *In re Sand-*

*ers*, 13 B.R. 320, 322–323 (Bkrtcy.D.Kan. 1981) (classification of claims governed by Section 1122, which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class"; claims subject to discharge only under Chapter 13 are not "substantially similar" to fully dischargeable claims).

jection, the court "may not approve the plan unless ... the plan provides that all of the debtor's projected disposable income ... will be applied to make payments under the plan." "Projected disposable income" was not defined in the 1984 amendments.

From 1984 until 2005, Congress provided no further guidance on evaluating the debtor's "best efforts." In this time period, the Court of Appeals for the Seventh Circuit weighed in on the issue of good faith and best efforts in several cases.

*In re Smith* held that the 1984 amendments to the code demonstrated "no specific [congressional] intent to change the prevailing 'totality of the circumstances' test." 848 F.2d 813, 819 (7th Cir.1988). The *Smith* opinion (following closely *In re Bassak*, 705 F.2d 234 (7th Cir.1983)) emphasized and expanded the importance of the fifth *Rimgale* factor, "fundamental fairness." "[B]road sets of factors ultimately merge into a generic 'totality of the circumstances' test" including "why the debtor filed under Chapter 13, how the debts arose, and whether those debts would be nondischargeable in Chapter 7." *Smith* at 818. Although the *Smith* opinion took an expansive view of the totality-of-the-circumstances test, it also held, "[t]hat a debt would be nondischargeable under Chapter 7, however, is not alone sufficient as a matter of law to constitute bad faith." In so holding, the court pointed out that "Congress had already legislated specifically that certain debts are nondischargeable in Chapter 13.... Congress could have easily added more exceptions to the list in § 1328(a) had it so intended." *Id.* at 818–19.

In *In re Schaitz*, 913 F.2d 452 (7th Cir.1990), Judge Posner observed that the debtors' schedules were accurate, their income modest, and their expenses justifiably high, yet he criticized the bankruptcy judge for failing to inquire "whether the plan could be said to be a sincere effort at repayment, or was instead an effort to thwart repayment." *Id.* at 453. This inquiry came to be touchstone of good faith in this circuit. *E.g., In re Smith*, 286 F.3d 461, 467 (7th Cir.2002) ("[A] Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditor's claims."); *In re Love*, 957 F.2d 1350, 1359 (7th Cir.1992) (upholding the denial of confirmation based almost exclusively on the fact that the debtor "filed bankruptcy to thwart the collection of taxes"). This inquiry does not fit neatly into any of the *Rimgale* factors. The debtor's motivation heretofore had not been a significant factor in the totality-of-the-circumstance test. After all, the "fundamental fairness" of a plan has only a tenuous relationship with the debtor's motive in filing the case. Judge Posner acknowledged that the Seventh Circuit "has yet to take sides on the difficult question of the proper meaning to assign 'good faith' in Chapter 13," and he declined to do so in *Schaitz. Id.* at 455.

*In re Love*, 957 F.2d 1350 (7th Cir.1992) was the first case to emphasize the distinction between good faith in filing a chapter 13 plan and good faith in filing a petition. The former is dictated by statute, § 1325(a)(3), but the latter only arose in relation to the judge-made rule that bad faith could be grounds for dismissal "for cause" under § 1307(c). (BAPCPA later codified the requirement that a petition be filed in good faith. § 1325(a)(7).) *Love* adopted the following factors—again, "nonexhaustive"—in determining whether a petition was filed in good faith:

■ the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 pro-

ceeding; [2] the timing of the petition; [3] how the debt arose; [4] the debtor's motive in filing the petition; [5] how the debtor's actions affected creditors; [6] the debtor's treatment of creditors both before and after the petition was filed; and [7] whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Id.* at 1357.

Regarding both the filing of the petition and the filing of the plan, the totality of the circumstances was held to be the determinative question.

*In re Smith* confronted a debtor's "deplorable" and fraudulent prepetition conduct. 286 F.3d 461, 467 (7th Cir.2002). The debt would not have been discharged in a chapter 7, but could be discharged in a chapter 13. First, *Smith* summarily disposed of an objecting creditor's argument that the petition was filed in bad faith based solely upon the debtor's "fraudulent conduct with respect to the underlying debt." *Id.* at 465. "[S]imply availing oneself of the more liberal provisions of Chapter 13 to discharge a debt that is not dischargeable in Chapter 7 is not sufficient to constitute bad faith." *Id.* at 465–66. The court observed that "Congress has made it clear that some debts, although nondischargeable in Chapter 7, may be discharged under the more liberal rules of Chapter 13.... We are not free to second-guess Congress' policy choice in this regard." The court in the good-faith analysis (specifically, good faith in plan filing) also declined to consider "low percentage repayment" of the debt to be a relevant factor. *Id.* at 468. The court noted, "Congress has not adopted a minimum payment for confirmation of a Chapter 13 plan, and we cannot read one into the Code through its good faith requirement." *Id.* Finally, the Court considered the creditor's argument that the debtor's financial disclosures

were inaccurate. "Chapter 13 requires that a debtor commit all of his disposable income to repayment of his debts.... Although this mandate is independent of the good faith requirement, courts also have considered the accuracy of a debtor's financial disclosures in determining whether a debtor has dealt fairly with his creditors." *Id.* The Court concluded that this argument was moot, because the bankruptcy judge modified the plan at the confirmation hearing to account for what he perceived to be inaccuracies in the debtor's statements.

*Smith* dulls the edge of the totality of the circumstances test. Smith states that one factor is irrelevant (pre-petition conduct) because Congress has legislated in the field (by making some, and not other debts dischargeable). Smith states that a second factor is irrelevant (repayment percentage) because Congress has *failed* to legislate the field (by requiring a minimum repayment). The question is thus: what are the proper factors to consider in the totality of the circumstances test?

BAPCPA introduced two provisions relevant to the good faith analysis. First, the petition must be filed in good faith. § 1325(a)(7). Second, "disposable income" was defined. § 1325(b)(2). The former appears to be nothing more than a codification of the long-standing judge-made rule and a corollary of § 1307(c)—that a petition can be dismissed "for cause." The latter introduces a long and complex calculation for determining the amount debtors must commit to their plans. Undoubtedly, Congress intended to limit the discretion of bankruptcy judges by providing a specific definition of "disposable income." The brute force calculation of disposable income under BAPCPA minimizes (in theory, at least) the guesswork required of bankruptcy judges and provides uniformity across the country.

*In re Mancl* confronted both good faith and the disposable income test. *Mancl v. Chatterton (In re Mancl)*, 381 B.R. 537 (W.D.Wis. Feb.12,2008). In *Mancl*, due to medical problems, the debtor's income in the six-month look-back period was significantly less than his anticipated post-filing income. The debtor calculated his plan payment based on the lower income, resulting in a lower plan payment, and the trustee objected to the plan. Confirmation was denied at the bankruptcy court, but affirmed on appeal to the district court. Departing from the majority view, the *Mancl* court held that the plain meaning of § 1325(b) mandated that disposable income be calculated from the six-month look-back period.

> The language of the bankruptcy code, as amended by BAPCPA, cannot sustain the majority interpretation. Before the BAPCPA amendments took effect, calculating disposable income involved a flexible and value judgment-laden inquiry into the propriety of Schedules I and J. In contrast, the bright line test of the amended § 1325(b) is a purely mechanical endeavor admitting of no discretion.... To adopt the majority view, one must assume that Congress created the precise and objective current monthly income definition of § 101(10A), mandated that bankruptcy courts apply it to the § 1325(b) test, and then added the term "projected" to empower bankruptcy courts to ignore the § 101(10A) definition, substituting their own sense of fairness by applying the former process of analyzing and comparing schedules I and J. Given the precision and detail of the statute, such an interpretation is untenable.
>
> Moreover, requiring strict adherence to the statute is entirely consistent with congressional objectives in changing the law. Replacing the previous nuanced and discretionary computation of dispos-able income with the uncompromising six-month average income determination deprived bankruptcy courts of discretion and made a certain number of harsh results inevitable for both debtors and creditors. It also enhanced consistency and predictability and limited the opportunities for manipulation of the process. There is no reason to believe that Congress did not anticipate and intend both of these effects. To the contrary, it is very likely that Congress anticipated the precise circumstances of this case, in which a pre-petition decline in income precipitates a bankruptcy filing, leaving debtors in a position of having to pay less than under the former regime.... Although it is understandable that bankruptcy courts might resist strict adherence to the code's new requirements in favor of retaining their former discretionary powers, it is apparent from the language and history of the BAPCPA that adherence to objectively defined standards and reduced judicial discretion is what Congress intended.

*Id.* at 541–42 (internal citation omitted).

The district court found that § 1325(b) should be strictly construed, and accordingly, the six-month look-back period definitively determined the debtor's disposable income. Next, the *Mancl* court considered the relationship between the sufficiency of plan payments and the debtor's good faith. The *Mancl* court observed that "the prevailing rule of law since the initial adoption of § 1325(b) in 1984 is that the sufficiency of resources committed to unsecured creditors is governed by that more specific provision and is no longer a consideration in good faith analysis under § 1325(a)(3).... The 2005 BAPCPA amendments support this conclusion...." *Id.* at 542 Finally, *Mancl* noted that if the debtor had engaged in pre-petition misconduct for the purpose

of diminishing the amounts available for the plan, then "the plan may not have been filed in good faith." *Id.* at 542.

■ *Mancl* is both controlling law and persuasive, but it does not entirely decide the issue here. *Mancl* stands for the proposition that the sufficiency of assets contributed to the plan has no bearing on the issue of good faith, so long as the payments have been properly calculated, and the payments are not artificially low because of prepetition misconduct. It is not alleged that the debtors here manipulated their pre-petition income.

*Mancl* does not address the other allegations of bad faith for these debtors. It is alleged that the debtors have inflated their expenses, live extravagant lifestyles, and voluntarily dismissed their case and refiled in order to avoid the repayment of $40,000 in preferences. These debtors also have significant exempt assets, including over $1 million in an ERISA retirement plan.

■ To determine the good faith of the debtors, the totality of the circumstances test is still good law, and it applies both to the filing of the petition and to filing of the plan. The *Schaitz* inquiry is the ultimate issue when considering the circumstances: are the debtors trying to pay their creditors, or are they trying to thwart them?

■ The debtors' expenses are high. The objections suggest that the debtor's listed expenses are not in line with their actual expenses. This bears on the accuracy of the debtor's schedules, and is thus relevant in the good faith inquiry. *Rimgale.*

Evidence supporting or refuting the accuracy of the debtor's listed expenses was sparse at the confirmation hearing. There was some testimony on the debtors' food budget. The debtors initially claimed to spend $900 per month and food on schedule J, but amended that expense to $800 four days before the confirmation hearing. (As a benchmark, the IRS recommends an allowance of $626 per month for a family of three.) At the hearing, Mr. Shafer testified that the food budget was high because he and his wife were on different diets: one diet was high protein, the other low protein. Mr. Shafer also testified that "smaller portions" of food led to the higher expense. I found Mr. Schafer's testimony on this subject to lack credibility.

In closer focus, it appears that the expenses have either been established or maintained at their high level under the assumption that to do so will limit what creditors will receive. If there has been active enlargement of expenses with an eye to discharging debts, then the creditors are being "thwarted." Expenses continued when they could have been reduced may only evidence the lack of the debtor's desire to pay creditors. For example, I have little doubt that the debtors' mortgage and utilities total $4331 per month as reported on schedule J, but to incur that level of debt service for financing home improvements nearly equal to the current value of the residence at a time when the claims of the objecting creditors were going unpaid raises a genuine question of the debtors' intent to pay.

I strongly believe that it is not the role of a bankruptcy judge to decree which of the debtors' expenses are too high. But, it is necessary to review how a debtor who seeks to discharge debts by making chapter 13 plan payments applies his or her resources. Debtors who demonstrate no effort to control unusually high expenses would have difficulty demonstrating that the filing was made in good faith. Home remodeling, large pension deductions and high food costs show a much greater concern for the debtors' current and future

maintenance of a very comfortable standard of living than with any effort to pay their existing creditors.

The debtors voluntarily dismissed a prior case when it was ordered that their plan could not be confirmed. One concern in the prior case was roughly $40,000 in pre-filing preferential payments. By filing the current case, (which was filed roughly two months after the prior case was dismissed, and which is materially the same as the prior case), the debtors sought to avoid restoration of these preferential payments. (A second concern at the confirmation hearing was whether the debtors had chosen the proper state for determining exemptions.) The preferential payments were not made to insiders. Evidence at the confirmation hearing provided no alternative motivation for the debtors' dismissing the prior case and refiling. Those preferential payments are now lost to creditors.

The debtors have significant encumbered or exempt assets and high income. Before the hearing, the parties stipulated to the value of the debtors' house: $550,000.[2] The debtors have recently spent $400,000 improving the house. The improvements include removal of asbestos, foundation repair, a room expansion, and a new kitchen. They gross over $144,000 a year in income, (according to Mr. Shafer's testimony, the income has recently dropped) yet according to their schedules, they have amassed no significant unencumbered property which might be liquidated[3] for the benefit of creditors.

Mr. Shafer has ERISA-qualified retirement funds valued at over $1,000,000. The funds are not available until Mr. Shafer retires. Mr. Shafer is 49 years old. When asked on cross examination if he planned on retiring early, Mr. Shafer responded, "Well, the profession I'm in right now I'm actually relatively old for the work I'm doing. So, you know, I think five to ten years is about as long as I can stay in this profession. I could possibly find another career after that." No explanation was provided as to why Mr. Shafer is old for his line of work.

Mr. Shafer's occupation raises more red flags: he is a senior manager of retirement solutions at the CUNA Mutual.[4] Conventional wisdom would say that a person in managing retirement solutions would be capable of living within a budget, or even building significant wealth. Yet these debtors have virtually no disposable income, and no nonexempt or unencumbered assets to speak of. The creditors are rightly concerned that in five years Mr. Shafer will retire, fresh out of bankruptcy. His unsecured debts would be discharged just in time to cash in on his retirement. Mr. Shafer's demeanor on the witness stand suggested that the debtors are engaged in this scheme. The debtors would be in an optimal financial position if Mr. Shafer chooses to retire in five to ten years. Based on the testimony at the hearing, I find that Mr. Shafer in fact plans to parlay this Chapter 13 case into an early and very comfortable retirement.

I have considered the accuracy of the debtors schedules, the amount of the debt-

---

2. This plan passes or fails the best-interests-of-creditors test depending upon whether 6% cost of sale is deducted from the $550,000. Because my decision rests on other grounds, there is no need to interpret the parties' stipulation and determine the proper value of the house.

3. More accurately, the property would be either liquidated or considered in the best-interest-of-creditors test, which would ultimately require increased monthly plan payments.

4. This was revealed not in the confirmation hearing, but the prior bankruptcy case.

ors expenses, the likelihood of Mr. Shafer's early retirement, his occupation, and the debtors' lifestyle and assets. Based on the foregoing, I conclude that these debtors filed both this plan and the chapter 13 petition in bad faith. No single circumstance is dispositive, but together, they indicate that the debtors fail the *Schaitz* test. These debtors are not trying to pay creditors; they are trying to avoid paying them.

This Chapter 13 case is dismissed. An order will be entered accordingly.

## ORDER DISMISSING CHAPTER 13 CASE

The Court having reached the conclusions of law contained in the memorandum decision filed this date, it is hereby ORDERED that the above captioned case is DISMISSED.